# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

---

In Re:

**James L. Thomas and
Laura L. Thomas,**

        **Debtors.**

**Bankruptcy Case
No. 11-41915-JDP**

---

## MEMORANDUM OF DECISION

---

**Appearance:**

John Avery, Idaho Falls, Idaho, Attorney for Debtors.

Jim Spinner, SERVICE & SPINNER, Pocatello, Idaho, Attorney for R. Sam Hopkins, Trustee.

### *Introduction*

Within the two weeks prior to filing for a chapter 7[1] bankruptcy case,

---

[1]  Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

MEMORANDUM OF DECISION - 1

debtors James and Laura Thomas ("Debtors") used $12,000[2] in a life

insurance policy's non-exempt cash value to fund two exempt individual

retirement accounts ("IRAs") of $6,000 each.  This reduced the cash value

in the insurance policies to $4,782.50, an amount within the $5,000.00 limit

of the Idaho exemption allowed for the policy.  Chapter 7 trustee R. Sam

Hopkins ("Trustee") objected to Debtors' claimed exemptions in the IRAs

and in the life insurance policy's remaining cash value, asserting that

Debtors' exemption planning amounted to fraud against their creditors,

disqualifying those exemptions from Debtors' use.  After a hearing, the

Court took his objection under advisement.  This Memorandum sets forth

the Court's findings of fact and conclusions of law regarding Trustee's

objection.  Rule 7052, 9014.

*Facts*

In 1990, Debtors purchased a MONY whole life insurance policy

---

[2] More precisely, Debtors withdrew $12,943.45 from the life insurance
policy's cash value, but only placed $12,000 in the IRAs.  Debtors' disposition of
the other $943.45 is not relevant to this decision.

MEMORANDUM OF DECISION - 2

insuring James'[3] life (the "Policy").  Exh. 200.  Among the documentation

sent to Debtors with the Policy, was a table indicating the "Cash or Loan

Value"[4] that could be expected for Debtors' use during the Policy's first

twenty years.  *Id.*  Per the table's estimates, the cash value would increase

between $575 and $725 per year, with the average yearly increase being

around $643.[5]  *See id.*

      Over time, the Policy's cash value increased as expected.  Yet, Laura

---

    [3]  Reference to first names is solely for the clarity of this decision; no disrespect is intended.

    [4]  This decision uses the terms "cash value" and "loan value" interchangeably throughout; both terms refer to the Policy's "Cash or Loan Value."

    [5]  The Policy states that the cash values indicated in the table are based on "The Commissioners 1980 Standard Ordinary Mortality Table."  Exh. 200.  In addition, one of the factors used to calculate the expected cash values was, apparently, "interest at the rate of 5% a year."  *Id.*  The annual increases, however, appear to be set at a roughly fixed dollar figure rather than at a percentage rate.  For example, when the cash value balance was $175, the value increased $600 over the next year.  *Id.* at 4.  Yet, when the cash value balance was $10,975, the next year's increase was still only $600.  *Id.*  Thus, for any given year, the increase in cash value appears to be independent of the Policy's cash value balance.

MEMORANDUM OF DECISION - 3

testified[6] that, sometime in 2011, due to financial concerns,[7] Debtors began

exploring various options, including placing the Policy's cash value in

another investment vehicle where, they hoped, it might earn a greater rate

of return.

Debtors also considered filing for bankruptcy.  In early June 2011,

Debtors contacted bankruptcy counsel John Avery ("Counsel "), who

provided them with a packet of information containing, among other

items, worksheets for use in completing bankruptcy schedules, statements

and forms, and a letter explaining "exemption planning in Idaho."  Ten

days after that meeting, James was diagnosed with cancer, and Debtors'

focus shifted from their financial affairs to caring for James' medical needs.

While she initially read through some of the paperwork provided by

Counsel, Laura testified that, once James was diagnosed, the paperwork

---

[6] Due to health concerns, James did not appear at the hearing on Trustee's
objection.

[7] Since April 2010, Debtors were both unemployed, and their income,
which was derived from social security and a modest pension from James'
former employer, was insufficient to cover their monthly expenses.

MEMORANDUM OF DECISION - 4

was put aside, and she never read the exemption planning information.

After Debtors focused on James' health for several months, the chronology of events is muddled.[8] The Court can, however, determine that, sometime in late October or early November, one of Debtors' creditors served them with a collection action complaint. This spurred Debtors to re-focus on their financial situation.

On November 10, 2011, Debtors returned to Counsel, paid him $1,300, and received another copy of his standard paperwork, including his exemption planning information. The next day, Debtor's tapped the

---

[8] Laura's testimony regarding these events is not consistent with the documentary evidence. For example, Laura testified that she took a loan against the Policy's loan value before she was served with a lawsuit by one of her creditors, and that Debtors re-approached Counsel after being served with that suit. In other words, per her testimony, the sequence of events was that Debtors (1) secured a loan against the Policy; (2) were served with the lawsuit; and, then, (3) contacted Counsel. The documents, however, indicate that Debtors (1) contacted and paid Counsel $1,300 on November 10, 2011; and (2) obtained the loan against the Policy on November 11. No evidence of the date of service of the lawsuit was presented. Nonetheless, it is clear that Debtors' loan against the Policy's value did not occur before they contacted Counsel. At the same time, the Court does not find that Laura intentionally misled the Court with her testimony. The series of events happened within a matter of days, and the Court suspects Laura's apparent confusion likely resulted from an inaccurate recollection, rather than from any intent to mislead the Court.

MEMORANDUM OF DECISION - 5

Policy's loan value, and obtained a variable interest rate[9] loan of $12,945.43.

Exh. 202.  After deducting the loan, the Policy's remaining loan value was

$4,872.50.  Laura explained that she left that amount to cover James'

expected final expenses.  The Idaho exemption limit on a debtor's interest

in an unmatured life insurance contract is $5,000.  Idaho Code § 11-605(10).

Laura testified that, when she obtained the loan, she intended to

invest it in something that would earn a greater return than the Policy,

though, admittedly, she did not have a firm plan in place to locate an

acceptable investment beyond calling an unnamed friend to see if he

would invest the money for Debtors.  Whatever her true intentions, she did

not use a friend to invest the money.  Instead, Laura spent $945.43 of the

loan, and, on November 16, opened two Roth IRAs with KeyBank, placing

$6,000 of the Policy's loan value in each.  *See* Exhs. 204, 205.  Each IRA paid

0.1% interest for a three-month term.  Laura's explanation for these

investment terms was that, after consulting a banker, she believed that she

_____

[9]  When the loan was secured, the variable interest rate was at 6%.  Exh.
202.

MEMORANDUM OF DECISION - 6

would not find a better interest rate elsewhere and that the IRAs' short

term would allow her to more easily invest the funds somewhere else at a

later date.  In divvying the funds between the two IRAs, Laura explained

that she simply split the $12,000 evenly.

Theday after opening the IRAs, Debtors met with Counsel again,

and provided him the paperwork to file their November 23, 2011,

bankruptcy petition.  In their schedules, Debtors claimed a $5,000

exemption in the Policy pursuant to Idaho Code § 11-605(9).  They also

claimed $6,000 exemptions in both IRAs pursuant to Idaho Code § 11-

604A.  Debtors amended their schedules on February 29, 2012, to clarify

that the Policy's cash value was $4,872.50, not $5,000.00, and to correctly

claim the cash value exemption pursuant to Idaho Code § 11-605(10), not

Idaho Code § 11-605(9).

Trustee objected to Debtors' claimed exemptions, asserting that

Debtors moved the Policy's loan value to the IRAs in an effort to defraud

their creditors, and that such is a basis for denying claimed exemptions.

MEMORANDUM OF DECISION - 7

Dkt Nos. 16, 29.[10]  Debtors responded, contending that the resulting

exemptions did not result from any intentional "exemption planning," but

from mere coincidence.

## *Discussion and Disposition*

### I.    There is no general fraud-based objection to a debtor's claimed exemptions.

Under the Bankruptcy Code, debtors may claim an exemption on

the value of certain property, which, if allowed, shields it from liquidation

as part of their bankruptcy estate.  § 522(b).  The exemptions available are

---

[10]  Trustee filed an initial objection to Debtors' claimed exemptions on January 12, 2012.  Dkt. No. 16.  Debtors did not respond to Trustee's objection, and Trustee, after filing a "Statement of No Objection" in accordance with LBR 2002.2(d)(3), requested the Court to enter an order sustaining his objections on February 17.  Dkt. Nos. 21, 22.  The Court entered an order disallowing Debtors' claimed exemptions on February 23.  Dkt. No. 23.  When Debtors amended their schedules to include the Policy's correct cash value and to reflect the correct exemption statute on February 29, Dkt. No. 26, Trustee objected to Debtors' amended claim of exemption.  Dkt. No. 29.  On March 16, Debtors moved to set aside the Court's February 23 order disallowing their exemptions, asserting that they did not respond to Trustee's January 12 objection due to an apparent misunderstanding that the objection was conditional and would be withdrawn upon receipt of certain documentation, which Debtors claim to have sent to Trustee in late January.  *See* Dkt. No. 32.  Debtors' motion to set aside the Court's order was heard concurrently with Trustee's objection to Debtors' amended claim of exemption, and, here, the Court considers Trustee's January 12 and March 8 objections together.

MEMORANDUM OF DECISION - 8

either those identified by the Code, or, if a state has "opted out" of the

Code's specific exemption scheme, those allowed by state law.  § 522(b)(2).

Idaho has opted out of the federal system, limiting the exemptions

available to Idaho debtors to those authorized by Idaho's statutes.  Idaho

Code § 11-609.

A debtor's exemptions are determined as of the date of their petition.

§ 522(b)(3)(A); *Culver v. Chiu (In re Chiu)*, 266 B.R. 743, 751 (9th Cir. BAP

2001); *In re Howlett*, 44 B.R. 186, 189 (Bankr. D. Idaho 2010).  And,

exemption statutes are to be construed liberally in favor of the debtor.  *In re*

*Steiner*, 459 B.R. 748, 751 (Bankr. D. Idaho 2010) (citing *In re Merrill*, 431 B.R.

239, 242 (Bankr. D. Idaho 2009)).  Where a trustee objects to a debtor's

claimed exemption, the trustee bears the burden of proving the claim is

improper.  Rule 4003(c); *Carter v. Anderson (In re Carter)*, 182 F.3d 1027, 1029

n.3 (9th Cir. 1999); *Hopkins v. Cerchione (In re Cerchione)*, 414 B.R. 540,

548–49 (9th Cir. BAP 2009).

Trustee, here, contends that Debtors' claimed exemptions as to the

Roth IRAs are improper because, he asserts, Debtors' conversion of non-

MEMORANDUM OF DECISION - 9

exempt insurance cash value to exempt IRAs within the two weeks prior to filing for bankruptcy amounted to a fraud upon their creditors.  However, the conversion of non-exempt assets into exempt assets on the "eve of bankruptcy" is not fraudulent per se.  *Gill v. Stern (In re Stern)*, 345 F.3d 1036, 1044–45 (9th Cir. 2003).  Indeed, where the only evidence presented is that non-exempt assets were "deliberately converted to exempt assets just prior to filing the bankruptcy petition," such evidence is "insufficient as a matter of law to establish fraud."  *Id.* (quoting *Wudrick v. Clements*, 451 F.2d 988, 990 (9th Cir. 1971)).  In other words, debtors may maximize their exemptions, even when they do so shortly before the filing of a bankruptcy petition.  *See also* House Report of Bankruptcy Reform Act of 1978, H.R. REP. NO. 95-595, at 361 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6317 ("As under current law, the debtor will be permitted to convert nonexempt property into exempt property before filing a bankruptcy petition.  The practice is not fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law.").

There are exceptions, though, designed to properly curb the practice

MEMORANDUM OF DECISION - 10

of "exemption planning" in contemplation of bankruptcy, including a

"fraud exception," which can have consequence for a debtor on "multiple

fronts." *See Wolkowitz v. Beverly (In re Beverly)*, 374 B.R. 221, 245 (9th Cir.

2007). One way in which that "exception" can impact a debtor's

bankruptcy case is manifest when a trustee acts to recapture assets

transferred as § 548(a) fraudulent conveyances. *Id.* (citing, as an example,

*Jensen v. Dietz (In re Sholdan)*, 217 F.3d 1006, 1009–10 (8th Cir. 2000)).

Trustees have also been allowed to employ their § 544 strong-arm power to

avoid transfers pursuant to state law. *See, e.g., Miguel v. Walsh*, 447 F.2d

724, 726–27 (9th Cir. 1971) (analyzing trustees' strong-arm authority under

§ 544's Bankruptcy Act predecessor, § 110(c)). Moreover, if a debtor's

intent to hinder, delay, or defraud creditors is evident in connection with

converting non-exempt to exempt assets, a debtor may risk a loss of

discharge pursuant to § 727(a)(2). *In re Beverly*, 374 B.R. at 245 (citing

*Smiley v. First Nat'l Bank of Belleville*, 864 F.2d 562, 568 (7th Cir. 1989);

*Norwest Bank Neb., N.A. v. Tveten*, 848 F.2d 871, 874–76 (8th Cir. 1988)).

Thus, while a debtor, in general, may engage in some exemption planning,

MEMORANDUM OF DECISION - 11

the debtor's plan is constrained by a trustee's ability to potentially avoid

transfers of property in anticipation of bankruptcy as fraudulent under the

Code, seek transfer avoidance under state law, to pursue denial of a

debtor's discharge.

Each of these trustee responses to a debtor's exemption planning

actions, however, requires the trustee to act beyond merely objecting to the

debtor's claimed exemptions.  Whether a trustee' s objection to an

exemption is sustained depends on whether the claim meets the

exemption's statutory requirements, including any exceptions.  *See, e.g.*, *In*

*re Hall*, 464 B.R. 896, 903–05 (Bankr. D. Idaho 2012) (analyzing whether

debtors' claimed exemption fell within a statutory exception); *In re*

*Bosworth*, 449 B.R. 104, 106–09 (Bankr. D. Idaho 2011) (sustaining a trustee's

objection to a motor vehicle exemption claim because an ATV does not

meet the statutory requirements for such an exemption); *In re Gardner*, 417

B.R. 616, 622 (Bankr. D. Idaho 2009) (in the context of a motion to avoid a

lien, finding there was no claimed homestead exemption where the

exemption statute's requirements were not met).

MEMORANDUM OF DECISION - 12

Occasionally, in Idaho, an exemption statute specifically excepts assets created in a transaction motivated by the debtor's "intent to defraud creditors." *See, e.g., In re Hall*, 464 B.R. at 903–05 (analyzing Idaho Code § 41-1836, which provides an exemption for certain annuity payments, though not for amounts paid into the annuity with the intent to defraud creditors). In such cases, it is entirely appropriate to consider a debtor's fraudulent intent in resolving a trustee's objection to the exemption. *Id.* However, the statutes relied on by Debtors here, Idaho Code §§ 11-605(10) and 11-604A,[11] do not include a fraud exception. Presumably, then, when

---

[11] Idaho Code § 11-605(10) provides an exemption in:

> An individual's aggregate interest, not to exceed five thousand dollars ($5,000) in any accrued dividend or interest under, or loan value of, any unmatured life insurance contract owned by the individual under which the insured is the individual or a person of whom the individual is a dependent.

Idaho Code § 11-604A provides:

> (1) It is the policy of the state of Idaho to ensure the well-being of its citizens by protecting retirement income to which they are or may become entitled. For that purpose generally and pursuant to the authority granted to the state of Idaho under 11

(continued...)

MEMORANDUM OF DECISION - 13

the Legislature intends that exemptions not be allowed for property

acquired as part of a debtor's scheme to defraud creditors, the exemption

statutes so provide.[12]  As a result, Trustee's argument that Debtors acted

with a fraudulent intent in establishing an exempt account is not a basis for

disallowing this particular exemption claim.

## II.    Trustee did not demonstrate that Debtors intended to

---

[11](...continued)
> U.S.C. section 522(b)(2), the exemptions in this section
> relating to retirement benefits are provided.
>
> ****
>
> (3) The right of a person to a pension, annuity, or
> retirement allowance or disability allowance, or death
> benefits, or any optional benefit, or any other right
> accrued or accruing to any citizen of the state of Idaho
> under any employee benefit plan, and any fund
> created by the benefit plan or arrangement, shall be
> exempt from execution, attachment, garnishment,
> seizure, or other levy by or under any legal process
> whatever.

[12]  While the Code's exemptions are not implicated here, Congress, too,
knew how, when appropriate, to create an express statutory limitation on
exemptions established as part of a debtor's scheme to defraud creditors.  *See*
§ 522(o) (reducing the value of exemptions on certain types of property
attributable to a debtor's transfer or disposition of property that the debtor could
not exempt during the 10-year period prior to the bankruptcy filing with the
intent to hinder, delay, or defraud a creditor).

MEMORANDUM OF DECISION - 14

**defraud their creditors.**

Even if Trustee were correct, and there were a legally recognized general fraud objection to allowance of a debtor's claimed exemptions, Trustee did not prove Debtors in this case intended to defraud their creditors when they established the IRA accounts.  In this respect, the comments of the Ninth Circuit Bankruptcy Appellate Panel, in discussing the line between legitimate exemption planning and an intent to defraud creditors in the context of a discharge denial action, are instructive:

> Only two things are certain about the line.
>
> First, . . . denial of discharge involving exemption planning requires that there be evidence other than the mere timing of the transformation of property from nonexempt to exempt status.
>
> Second, there is a principle of "too much." . . .  The reality is that cases finding discharge-disqualifying intent to hinder, delay, or defraud creditors typically involve some combination of large claims of exemption and overtones of overreaching.

*In re Beverly*, 374 B.R. at 245 (internal citations omitted).

    1.   <u>Evidence of fraudulent intent</u>.

MEMORANDUM OF DECISION - 15

Trustee asserts the following facts are indicative of Debtors'

fraudulent intent:  that Debtors transferred the funds from the nonexempt

insurance cash value to the IRAs a short time before filing for bankruptcy;

that Debtors did not disclose the transfer in their schedules, Statement of

Financial Affairs ("SOFA"), or otherwise; that the transfer was a poor

investment; and that the amounts concealed within the exempt assets are

too close to the exemption limits for the transfer to have been coincidental.

A.   Timing of the transfer.

There is no doubt that Debtors' transfer of the insurance value to the

IRAs occurred within just a few weeks of their bankruptcy filing.  The

mere timing of a transfer from a non-exempt to an exempt asset on the eve

of bankruptcy, without something more, however, is insufficient for a

finding of fraud.

B.   Non-disclosure of the transfer.

Debtors do not dispute that, while their schedules identified the

Policy's and the IRAs' existence, the transfer from the insurance policy to

the IRAs was not disclosed in their schedules or SOFA.  Trustee argues

MEMORANDUM OF DECISION - 16

that Question 10.b. of the SOFA, which requires debtors to "[l]ist all property transferred by the debtor within ten years immediately preceding the commencement of [a] case to a self-settled trust or similar device of which the debtor is a beneficiary," required Debtors to disclose the timing of the IRAs' creation.  In Trustee's view, an IRA is "a self-settled trust or similar device."

"Self-settled trust" is not defined in the Code.  Per Black's Law Dictionary, it is "[a] trust in which the settlor is also the person who is to receive the benefits from the trust, usu. set up in an attempt to protect the trust assets from creditors."  BLACK'S LAW DICTIONARY 1654 (9th ed. 2009). IRAs are creatures of the Internal Revenue Code, defined as "trust[s] created or organized in the United States for the exclusive benefit of an individual or his beneficiaries."  26 U.S.C. § 408(a).  If, as is typical, an IRA is established by the individual that "benefits" from the trust, the IRA would seem to meet the self-settled trust definition.  Some courts have so concluded.  *See, e.g.*, *In re Zott*, 225 B.R. 160, 168 n.10 (Bankr. E.D. Mich. 1998) (finding that "an IRA is, by nature, a self-settled trust"); *In re Herbert*,

MEMORANDUM OF DECISION - 17

140 B.R. 174, 178 (Bankr. N.D. Ohio 1992) (concluding that "an IRA is a

self-settled trust"); *In re Ree*, 114 B.R. 286, 289 (Bankr. N.D. Okla. 1990)

(finding that, if the IRA in question were a trust, it would be a self-settled

trust). Laura, who established both of the IRAs, was the beneficiary of

one. At least as to that IRA, Trustee makes a persuasive argument that the

IRA is a self-settled trust and should have been disclosed in the SOFA.

At the same time, Counsel explained that he did not understand

SOFA Question 10.b. to apply to IRAs, and that if the transfer to the IRAs

should have been identified in Debtors' SOFA, it was the result of his

error, not that of his clients. But this explanation can not excuse a failure

to make adequate disclosure in Debtors' bankruptcy documents. *See*

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396

(1993) (indicating that an attorney's mistakes do not relieve his clients of

the consequences).

Even so, the question here is whether it was *Debtors'* intent to

defraud their creditors by not including the information. Because the

prebankruptcy transfer to the IRAs resulted from Counsel's potential

MEMORANDUM OF DECISION - 18

misunderstanding of the SOFA questions, and not because of Debtors'

intent, the omission does not assist Trustee in proving Debtors' intended to

defraud their creditors.

C.     Debtors' transfer as an investment decision.

Trustee argues it was clearly unwise for Debtors to borrow money

from their insurance value at 6%, removing it from the Policy, where it

was growing by $643 per year on average, only to then invest the funds in

IRA accounts earning a mere 0.1% annually.  Obviously, there is no sound

financial explanation for Debtors' decision to obligate themselves to repay

the money to their insurer with interest, rather than tapping the Policy's

cash value.[13]  It is not clear, however, that their judgment to deposit the

money in the IRAs, rather than to leave it in the Policy, was a poor one.

Any increase in the IRAs was tied to a percentage of the accounts'

balance at any given time.  The Policy, however, has consistently grown

from between $575 and $725 a year, regardless of the cash value balance in

_____

[13]  In the Court's opinion, this factor does not indicate an intent to defraud
creditors, but, rather, tends to show that Laura was not thinking through the
financial consequences of her decisions in arranging Debtors' financial affairs.

MEMORANDUM OF DECISION - 19

any given year.[14]  *See* Exh. 200 at 4.  Trustee has not presented evidence

indicating this pattern will change now that Debtors have taken a loan

against the Policy.  Though Debtors reduced the cash value balance of the

Policy to $4,872.50, there is no indication that the Policy's value will not

increase by $600 to $700 this year, just as it presumably would have had

Debtors not reduced the cash value.  Debtors' decision to place the cash

value into interest-earning accounts, even one with a near-negligible rate,

may, therefore, have been a better financial decision than leaving the funds

where no interest would accrue.

      D.    <u>Exemption limits</u>.

Finally, Trustee contends that Debtors' retention of a cash value in

the Policy near Idaho's statutory exemption limit demonstrates that

Debtors intended to defraud their creditors.  Idaho Code § 11-605(10)

allows a debtor to exempt up to $5,000 in a life insurance policy's value.

Debtors left $4,872.50 in the Policy, and could have taken greater

---

[14]  Even when, early on, there was as little as $175 in the Policy's cash
value, the value increased by $600 over the next year.  *See* Exh. 200 at 4.

MEMORANDUM OF DECISION - 20

advantage of the exemption limit had they chosen to do so.  In addition,

Debtors could have claimed up to $5,000 of the Policy's cash value as

exempt even if they had not transferred the non-exempt cash value, and it

is not entirely clear how Debtors' decision to continue the exemption's use

indicates an intent to defraud their creditors.[15]

Trustee also insists that fraud is shown because Debtors created two

IRAs, instead of one.  Trustee contends this fact demonstrates that Debtors

were sophisticated enough to take full advantage of their deposits under

tax laws that would not be available to them for a single $12,000 IRA,

which, he argues, demonstrates their ability to manipulate their

exemptions to defraud creditors.  The Court disagrees.  Debtors' use of

two accounts to maximize tax benefits simply does not indicate that they

intended to defraud their creditors.

_____

[15] It certainly may indicate that Debtors were sophisticated enough in
their exemption planning to understand the exemption statutes' limitations.
Debtors, however, are allowed to maximize the use of their available exemptions,
*see In re Stern*, 345 F.3d at 1044–45, and the Court would expect a debtor
attempting to maximize the use of his exemptions to run up against the statutory
exemption limits.

MEMORANDUM OF DECISION - 21

2.     <u>The extent of Debtors' exemption planning does not</u>
<u>give rise to "overtones of overreaching."</u>

The magnitude of Debtors' exemption planning does not imply that

they used such planning to defraud their creditors.  While the transferred

$12,000 was Debtors' only non-exempt asset, any appearance of injustice to

creditors resulting from the transfer stems from the fact that Debtors

simply did not have many non-exempt assets to begin with—*any*

exemption planning by Debtors would have placed assets beyond

creditors' reach.  *Compare with In re Beverly*, 374 B.R. at 245–46 (finding

large claims and overtones of overreaching where the debtor's exemption

planning included the conversion of nearly $424,450, in a prolonged effort

to avoid paying one particular creditor).  Debtors should not lose their

IRAs simply because they had few assets that would benefit from

exemption planning.

### *Conclusion*

There is no general fraud-based objection to a debtor's claimed

exemptions.  Even if there were such an objection, Trustee did not prove

MEMORANDUM OF DECISION - 22

Debtors intended to defraud their creditors when they established the IRA

accounts.

Trustee's objection to Debtors' claimed exemptions will be denied in

a separate order.

Dated:  July 9, 2012

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION - 23